UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:00CV-548-H

PIZZA MAGIA INTERNATIONAL, LLC, et al.                                    PLAINTIFFS

and

OHIO CASUALTY INSURANCE CO.,                        INTERVENING
                                                     PLAINTIFF


V.


ASSURANCE COMPANY OF AMERICA                                    DEFENDANT


**MEMORANDUM OPINION**

This litigation has now been pending for over six years.  The remaining issues concern

Assurance Company of America's ("Assurance") duty to indemnify and defend Pizza Magia

International, LLC ("Pizza Magia") and Ohio Casualty Insurance Co. ("Ohio Casualty") for the

settlement costs and other expenses incurred in the underlying litigation.  Discovery is now

complete on this last phase.  The parties have filed excellent memoranda concerning the legal

issues and have made helpful presentations during oral argument.

The Court must address four legal issues: (1) whether the underlying claims for trade

dress and trademark infringement constitute an "advertising injury" within the meaning of

Assurance's Commercial General Liability ("CGL") policy; (2) whether the loss-in-progress

doctrine bars coverage for those claims; (3) whether Assurance nevertheless had a duty to defend

Pizza Magia in the underlying action; and (4) whether Assurance can be liable for bad faith

based on its failure to do so.   To do so requires the Court to predict how Kentucky courts would

act in several instances.  The result is a mixed one.

## I.

The current insurance coverage dispute has its origins as far back as 1999 when certain former executives, franchisees and employees of Papa John's International, Inc. ("Papa John's) terminated their various relationships with that company and began planning a new business venture.  In June, 1999, they incorporated Pizza Magia as a business to own, operate and franchise carry-out pizza stores.  Pizza Magia opened its first store in late August, 1999.

Papa John's soon grew concerned that its former employees and franchisees were engaging in various kinds of illegal activity.  On October 29, 1999, Papa John's wrote Pizza Magia, complaining about the violation of various agreements, misappropriation of trade secrets and other possible legal activity.  Direct contact and other letters between the parties followed. The parties were unable to resolve their differences; so on September 12, 2000, Papa John's filed suit against Pizza Magia, alleging, *inter alia*, trademark and trade dress infringement.

During the time between September 1, 1999, through August 30, 2000, Ohio Casualty provided CGL coverage to Pizza Magia.  As of September 1, 2000, Pizza Magia changed its insurance coverage.  From that date forward Assurance provided coverage under a virtually identical policy.  At the outset of the litigation, however, Pizza Magia demanded that both Ohio Casualty and Assurance provide coverage for Papa John's claims.  Initially, Ohio Casualty asked this Court to declare that it owed no duties of defense or indemnification to Pizza Magia. Notwithstanding this request, from the outset Ohio Casualty provided a defense for Pizza Magia. Assurance eventually denied coverage and declined to provide a defense under its policy.

For almost three years Papa John's and Pizza Magia vigorously and contentiously battled

2

one another before finally reaching a settlement, in which Ohio Casualty and Pizza Magia ended up paying equal amounts to Papa John's.  Assurance declined to participate in the settlement. Since that settlement, the subsequent insurance coverage dispute has begun to rival the underlying litigation in both its complexity and its duration.  Ohio Casualty argues that Assurance should share pro rata in any expenses Ohio Casualty has incurred.  Pizza Magia argues that it is entitled to indemnification under the Assurance policy for the amounts that it paid to settle the lawsuit.

The applicable Assurance policy provision describes coverage for  "'[a]dvertising injury' caused by an 'offense' committed in the course of advertising your goods, products or services." Only five of Papa John's original claims are relevant here.[1]  Those claims are contained in Count IX and Count X of the First Amended Complaint.  Count IX alleges violations of the Federal Trademark Act.  Count X alleges violations of the Kentucky law of trade secrets, service mark, trade dress and unfair competition.  Generally, Papa John's alleged that Pizza Magia (1) adopted a product and business model virtually identical to it; (2) used dough and sauce strikingly similar in taste and texture to Papa John's; and served customers garlic butter as a matter of course. Papa John's considered the service of garlic butter a "unique selling technique" that it had developed.

---

[1]  In total, Papa John's First Amended Complaint alleged multiple causes of action against Pizza Magia and a number of its employees and officers including, trademark and trade dress infringement, service mark infringement, unfair competition, misappropriation, breach of non-competition and confidentiality agreements, tortious interference with contract, violations of Federal Computer Fraud and Abuse Act, and copyright infringement under the Federal Copyright Act.  By Joint Stipulation entered on December 23, 2002, Pizza Magia stipulated that the Ohio Casualty policy was not applicable to and did not provide coverage for any of the foregoing causes of action except for the claims at issue in this case: violations of the Federal Copyright Act, violations of the Federal Trademark Act, and various violations of the Kentucky law of unfair competition.  Pizza Magia and Ohio Casualty are only seeking indemnification from Assurance for those claims given that the language of Assurance's policy is identical to Ohio Casualty's.

3

According to Ohio Casualty and Pizza Magia, these allegations in the Complaint assert that Pizza Magia had misappropriated Papa John's style of doing business, i.e., Papa John's comprehensive manner of operating its business.  The First Amended Complaint alleges that Pizza Magia "copied and misappropriated virtually all material aspects of plaintiffs operations and methods of doing business" including "advertising and promotional items."  The Complaint alleges that Pizza Magia, like Papa John's, is a pizza carry-out and delivery restaurant in Kentucky and Indiana and that Pizza Magia's officers conspired together to make pizza based on Papa John's trade secret formulas in order to trade on Papa John's reputation for quality.  The Complaint notes that "Papa John's overall appearance of its traditional pizza, including its full-bodied, raised border crust, its cheese on top of its ingredients and its topping ingredients poking through the cheese, acquired distinctiveness and was famous in the marketplace prior to Defendant Pizza Magia's opening for business."  First Amended Complaint, p. 33, para. 117.

Ohio Casualty and Pizza Magia point out that other portions of the Complaint allege that Pizza Magia misappropriated Papa John's advertising idea, or "promotional technique," of including free garlic sauce with each order without customer request.  The Complaint states that "the individual defendants . . .copied Papa John's signature promotional technique of providing free garlic sauce with each order of pizza."  First Amended Complaint, pp. 9-10, para. 22.  Finally, the Complaint asserts that Pizza Magia copied and then advertised an imitation of Papa John's traditional pizza.   Specifically, the Complaint alleges that "Defendant Pizza Magia has advertised and sold pizzas which use or constitute a colorable imitation of the overall appearance of Papa John's traditional pizza."  First Amended Complaint, p. 35, para. 125.  In other words, Papa John's alleged that Pizza Magia advertised an imitation of Papa John's traditional pizza to

4

promote its own pizza sales.

All of these allegations must ultimately be compared to the coverage provisions contained in the Assurance policy. That policy defines an "advertising injury" to include misappropriation of advertising ideas and style or doing business:

> "Offense" means one or more of the following:
> ...
> b.     With respect to "advertising injury":
>       (1)     Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>       (2)     Oral or written publication of material that violates a person's right to privacy;
>       (3)     Misappropriation of advertising ideas or style of doing business; or
>       (4)     Infringement of copyright, title or slogan.

Pizza Magia and Ohio Casualty argue that the conduct alleged in the Complaint and the First Amended Complaint constitutes "misappropriation of advertising ideas or style of doing business."

## II.

This Court must apply Kentucky law to determine the meaning of this insurance policy. Thus, the Court must look at the policy as a whole and give every provision its full meaning and operative effect. *Kemper Nat'l Ins. Cos. v. Heaven Hill Distilleries*, 82 S.W.3d 869, 875-76 (Ky. 2002). The plain and ordinary meaning of the policy language governs if it is clear and unambiguous. *Nationwide Mut. Ins. Co. v. Nolan*, 10 S.W.3d 129, 131 (Ky. 1999). Because the insurance carrier typically drafts the policy, where policy language is ambiguous, that language is to be construed in the light most favorable to the insured. *Kentucky Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky. 1992) (internal citations omitted). Here, Sections

III and V of this Memorandum Opinion concern insurance contract interpretation: applying unambiguous contract language to undisputed facts. In such an instance, the Court decides these issues as a matter of law.

On the other hand, sections IV and VI of this Memorandum Opinion concern issues which require a combination of actual fact-finding and defining legal standards. Under these circumstances, the Court's authority to render a final decision is more circumscribed. Summary judgment is appropriate if no genuine issue of material facts exists and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III.

Pizza Magia has settled claims of federal trade dress infringement, trademark infringement, copyright infringement claims as well as state law claims of trade secret and service mark violation, and unfair competition. This Court must decide whether the Assurance policy covers any injury that the settlement agreement compensates. That question requires this Court to decide, first, whether the causes of action in the underlying case gave rise to an "advertising injury," and, if so, whether a "causal connection" exists between that injury and the "advertising activity" that Pizza Magia undertook. *Cincinnati Ins. Co. v. Zen Design Group, Ltd.*, 329 F.3d 546, 553 (6th Cir. 2003). The insurance policy lists four categories of covered harms that may constitute "advertising injuries." The parties agree, and this Court concurs, however, that only the provision encompassing "misappropriation of advertising ideas or style of

doing business" is relevant in this case.[2]  Thus, the precise question presented is whether the trade dress infringement and related claims in the underlying suit constitute a "misappropriation of advertising ideas or style of doing business."

A.

In answering that question, this Court must decide first whether trade dress infringement, which forms the gravamen of Papa John's complaint, can ever be a "misappropriation of advertising ideas or style of doing business."  Recently, the Sixth Circuit held that trade dress infringement cannot constitute "misappropriation of advertising ideas or style of doing business" when it interpreted a policy with identical language as ours.  *See Advance Watch Co. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795,  802 (6th Cir. 1996) (concluding that "'misappropriation  of advertising ideas or style of doing business' does not refer to a category or grouping of actionable conduct which includes trademark or trade dress infringement").  However, in that case the Sixth Circuit interpreted the relevant policy language under Michigan law. The Sixth Circuit's interpretation of Michigan law, although persuasive, is not binding authority.  No Kentucky state court has ever addressed the issue and no other court has attempted to interpret Kentucky law.  What this Court is bound to do in this situation is to "ascertain from all available data . . . what the state's highest court would decide if faced with the issue."  *Grantham and Mann, Inc. v. American Safety Products, Inc.*, 831 F.2d 596, 608 (6th Cir. 1987).

It would be easy enough to simply adopt the Sixth Circuit's view.  In these

---

[2]  Papa John's asserted a claim against Pizza Magia for violating the Federal Copyright Act in Count VIII of the First Amended Complaint.  That count alleged that Pizza Magia plagiarized Papa John's business documents and manuals.  No one has argued that this claim triggers a duty to indemnify even though copyright infringement is expressly included in the policy's definition of "advertising injury."  Presumably, this is because there is no clear causal connection between Pizza Magia's misappropriation of the business documents and advertising.

7

circumstances, however, that is not this Court's charge.  Nor is a Sixth Circuit opinion

necessarily a safe haven. For starters, *Advance Watch* represents a minority view.  Although it

has been reaffirmed within the Sixth Circuit,[3] other jurisdictions have repeatedly criticized it.

*See, e.g.*, *Frog, Switch, Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 747 (3d

Cir. 1999) ("Advance Watch has been sharply criticized for ignoring the real contours of

intellectual property litigation, which often proceeds under a bewildering variety of different

labels covering the same material facts.") (citation omitted); *Gemmy Indus. Corp. v. Alliance*

*General Ins. Co.*, 190 F. Supp. 2d 915, 920 (N.D. Tex. 1998) (finding that adopting the

reasoning of *Advance Watch* "would circumvent well-established principles of contract

construction").  Indeed, the majority rule is that trade dress infringement and trademark

infringement can constitute "misappropriation of advertising ideas and style of doing business,"

depending on the nature of the factual allegations in the underlying action.  *See, e.g.*, *Hyman v.*

*Nationwide Mut. Fire Ins. Co.*, 304 F.3d 1179, 1191 (11th Cir. 2002) (Florida law);  *R.C.*

*Bigelow, Inc. v. Liberty Mut. Ins. Co.*, 287 F.3d 242, 247-48 (2d Cir. 2002) (Connecticut law);

*Applied Bolting Technology Products, Inc. v. U.S. Fidelity & Guar. Co.*, 942 F. Supp. 1029,

1034 (E.D. Pa. 1996).  For these reasons, this Court has doubts that the Kentucky Supreme Court

would adopt the Sixth Circuit's reasoning.

        In making any analysis, Kentucky courts would begin with the language of the coverage

section.  Because the policy does not define the terms in that provision, each must be accorded

its ordinary meaning.  *See Nationwide Mut. Ins. Co.*, 10 S.W.3d at 131.  Initially, as it is

---

[3] *See ShoLodge, Inc. v. Travelers Indem. Co. of Illinois*, 168 F.3d 256 (6th Cir. 1999) (interpreting
Tennessee law); *Weiss v. St. Paul Fire and Marine Ins. Co.*, 283 F.3d 790 (6th Cir. 2002) (Ohio law).

commonly understood, advertising means the " 'action of calling something to the attention of the public.' " *Hyman*, 304 F.3d at 1188 (quoting *Adolfo House Distrib. Corp. v. Travelers Prop. & Cas. Ins. Co.*, 165 F. Supp. 2d 1332, 1339 (S.D. Fla. 2001)).  Therefore, "[a]n 'advertising idea,' . . . can be any idea or concept related to the promotion of a product to the public." *Id.* (citing Black's Law Dictionary (7th ed.1999)); *see also Sentex Sys., Inc. v. Hartford Accident & Indem. Co.*, 93 F.3d 578, 580 (9th Cir. 1996) ("In this day and age, advertising cannot be limited to written sales materials, and the concept of marketing includes a wide variety of direct and indirect advertising strategies.").  At first glance, the term "style of doing business" appears to be a rather general formulation.  It has been routinely defined as "referring to 'a company's comprehensive manner of operating its business.'"  *Novell, Inc. v. Fed. Ins. Co.*, 141 F.3d 983, 987 (10th Cir. 1998) (citations omitted).  However, as the Eleventh Circuit noted in *Hyman*, "it is important to recognize that the phrase is meant to describe an 'advertising injury.'"  *Hyman*, 304 F.3d at 1188.  Therefore, this Court agrees with the Eleventh Circuit and concludes that the most natural reading of the phrase "must include the manner in which a company promotes, presents, and markets its products to the public." *Id.* at 1189.

Trade dress is defined as "the total image of a product and may include features such as size, shape, color or color combinations, textures, graphics, or even particular sales techniques." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983) (citations omitted).  Therefore, although " 'the classic trade dress infringement action involved the packaging or labeling of goods' . . . it may 'extend to marketing techniques' and can include certain 'sales techniques designed to make the product readily identifiable to consumers and unique in the marketplace.' " *Hyman*, 304 F.3d at 1189 (citations omitted).  Because trade dress

encompasses marketing or packaging designed to draw attention to a product, it may constitute an "advertising idea" or "style of doing business" as those terms are defined above.[4]  In sum, a product's trade dress may constitute an "advertising idea" or a "style of doing business" under Kentucky law although it may not always do so.

In its First Amended Complaint, Papa John's generally asserted that the Pizza Magia product and business model were virtually identical to Papa John's; that the taste and the texture of Pizza Magia's pizza were a colorable imitation of its own; and that like Papa John's, Pizza Magia served customers free garlic butter with each order without customer request.  In sum, Pizza Magia plainly designed the look of the pizza, the taste of the pizza and the provision of free garlic sauce to promote its products by appropriating ideas and a certain style from Papa John's. This Court concludes that these aspects of the trade dress for the pizzas Pizza Magia produced and marketed constitute an "advertising idea" or "style of doing business" as Kentucky courts would define those terms.

## B.

Next, this Court must determine whether a causal connection exists between the advertising injury and Pizza Magia's advertising activity.   This requirement originates from the policy's coverage for "advertising injury caused by an offense committed in the course of advertising."  Thus, " 'the injury for which coverage is sought must be caused by the advertising itself.' " *Hyman*, 304 F.3d at 1192 (quoting *Microtec Research, Inc. v. Nationwide Mutual Ins. Co.*, 40 F.3d 968, 971 (9th Cir. 1994)); *see also Advance Watch*, 99 F.3d at 806 ("The policy . . .

---

[4] For its part, a trademark is defined as  "any word, name, symbol, or device, or any combination thereof" which is used or intended to be used by a person "in commerce . . .  to identify and distinguish his or her goods . . .." 15 U.S.C. § 1127.

requires some nexus between the ground of asserted liability and the insured's advertising activities before there is coverage or a duty to defend.").

Again relying on *Advance Watch*, Assurance argues that no such causal connection exists because the only specific reference to advertising in the complaint is that Pizza Magia "advertised and sold" pizzas that imitated the Papa John's appearance.  In *Advance Watch*, the Sixth Circuit held that even assuming that the insured's alleged trademark and trade dress infringement constituted misappropriation of style of doing business, the required causal nexus between advertising and the injury was lacking.  The court so held even though the insured published catalogues and advertisements displaying the alleged infringing product.  It reasoned that the appearance and shape of the product itself and not the advertising had caused the injury. The court in *Advance Watch* stated:

> Contrary to the district court's conclusion, we conclude that even if Advance could be said to have misappropriated Cross' advertising ideas or style of doing business, it cannot reasonably be said to have done so in the course of advertising its writing instruments, when it is the shape and appearance of the writing instruments themselves which Cross claimed to have caused injury.  Advance argues that the appearance of its Pierre Cardin writing instruments was in itself advertising, but this argument proves too much, for it would invoke advertising injury coverage and the duty to defend whenever a product is merely exhibited or displayed.

*Id.* at 807; *see also Simply Fresh Fruit, Inc. v. Continental Ins. Co.*, 94 F.3d 1219, 1223 (9th Cir.1996) (in order to invoke the coverage of the policy, "the advertising activities must cause the injury–not merely expose it.").  In other words, under *Advance Watch*, if the offense is merely revealed by advertising, no connection is present.

Outside the Sixth Circuit, courts seem more lenient in finding a causal nexus in the area of trademark and trade dress infringement.  Indeed, because trademark rights involve the

11

appearance of a product, a number of courts have found the required causal nexus on the theory that advertisements displaying the infringing product must be deemed to be harmful. *See, e.g.*, *Hyyman*, 304 F.3d at 1193; *R.C. Begelow, Inc. v. Liberty Mutual Ins. Co.*, 287 F.3d 242, 248 (2d Cir. 2002). For example, in *R.C. Begelow*, the Second Circuit explained that in a trade dress action, "the alleged 'offense' is creating consumer confusion by the use of copied trade dress. . .." *R.C. Begelow*, 287 F.3d at 248. Finding the requisite causal connection, the court reasoned that, the insured's "ads displayed the allegedly infringing trade dress. If, as [the plaintiff] alleges, [the insured's] copied trade dress created consumer confusion, the ads could have been found to have contributed to such confusion." *Id.*

Under this reasoning, the allegations here establish the requisite causal nexus because the ads could have contributed to consumer confusion. This Court need not determine which approach the Supreme Court of Kentucky would adopt, however, because Papa John's has made an allegation that distinguishes our case from those like *Advance Watch*. Here, Papa John's alleged that Pizza Magia copied Papa John's promotional technique of providing free garlic sauce with each order without a customer request. This is not just an advertising idea; it is an act of advertising. Therefore, it establishes the required causal nexus.

Based upon this analysis, the Court concludes that the language of the Assurance policy taken alone requires Assurance to indemnify and defend Pizza Magia in its underlying litigation with Papa John's.

IV.

Assurance argues that even though its policy may cover the loss, the "loss-in-progress" or "known loss" doctrine bars Pizza Magia's claim. This doctrine precludes coverage when the

12

insured is aware of an ongoing progressive loss at the time the policy becomes effective.  *See, e.g.*, *Am. & Foreign Ins. Co. v. Sequatchie Concrete Servs.*, 441 F.3d 341, 344 (6th Cir. 2006) (applying Tennessee law).  In some form or another, the "loss-in-progress" doctrine is widely accepted as a fundamental principle of insurance law.  *Inland Waters Pollution Control, Inc. v. Nat'l Union Fire Ins. Co.*, 997 F.2d 172, 179 (6th Cir. 1993) ("We are unaware of any case in which a court has rejected the doctrine as internally fallacious or inconsistent with the general principles of insurance law . . . .").  Cf. 7 Couch on Insurance § 102:9 ("The known risk, known loss, and loss-in-progress defenses are generally considered to be part of the 'fortuity' requirement that runs throughout insurance law.").  It embodies " 'the principle that losses which exist at the time of the insuring agreement, or which are so probable or imminent that there is insufficient 'risk' being transferred between the insured and the insurer, are not proper subjects of insurance.' "  *Am. & Foreign Ins. Co.*, 441 F.3d at 344 (quoting 7 Couch on Insurance § 102:8).  Despite the concept's widespread acceptance, courts have not settled upon a uniform standard for its application and even where the standard is uniform, it is difficult to apply it to the facts of a given case in a consistent way.

A.

No Kentucky case has expressly spoken on the "loss-in-progress doctrine."  However, the Supreme Court of Kentucky recently reaffirmed a related doctrine, the principle of fortuity in *Aetna Cas. & Sur. Co. v. Commonwealth*, 179 S.W.3d 830 (Ky. 2005).[5]  The principle of fortuity and the loss-in-progress doctrine are variations of the same basic concept.  *See National Union*

---

[5] Justices Cooper and Roach dissent and their writing is actually helpful understanding the scope of the doctrine that the majority adopted.

*Fire Insurance Company of Pittsburgh, Pa. v. The Stroh Companies, Inc.*, 265 F.3d 97, 106 (2d Cir. 2001) (discussing fortuity and loss-in-progress).  The fortuity principle, like the loss-in-progress doctrine, presumes that the purpose of insurance is to spread risk; therefore, where the insured intentionally or willfully causes the loss at issue, the loss is uninsurable.  7 Couch on Insurance § 101:22; *see also Aetna Cas. & Sur. Co.*, 179 S.W.3d at 835 (" 'Fortuity' is the principle that an insured cannot have coverage for those things that are 'expected or intended' from the covered conduct.").[6]

The *Aetna* case concerned radioactive materials intentionally deposited in a disposal facility.  Many years later the EPA required the owner to cleanup the hazard.  The owner's current insurance company refused to defend or indemnify them.  The Kentucky Supreme Court concluded that the insurance companies were entitled to a jury instruction on the concept of fortuity.  The court reasoned that "the requirement that loss be fortuitous, i.e. not intended, is a concept inherent in all liability policies." *Aetna Cas. & Sur. Co.*, 179 S.W.3d at 836.  The court held that the trial court should have instructed the jury that the Commonwealth was entitled to insurance coverage "unless it specifically and subjectively intended to cause the migration of radioactive contamination."  *Id.* at 836.  By reaffirming the fortuity defense, the Supreme Court of Kentucky reaffirmed the principle that a loss is insurable only where the loss is sufficiently uncertain.

---

[6] The doctrine of fortuity and the loss-in-progress doctrine address these concerns about risk and uncertainty in two different ways.  The loss-in-progress doctrine bars coverage where the insured is aware that a specific loss is imminent or still occurring at the time the policy becomes effective.  "It is the fact the causative agent can be identified, and that this agent increases the likelihood of loss substantially above what it was before these facts were known, that supports the use of the doctrine." 7 Couch on Insurance § 102:8.  The fortuity doctrine, on the other hand, applies where the insured expects or intends the harm to occur, which substantially increases the risk of harm regardless of when the harm occurs.  Accordingly, the Court does not mean to imply that the doctrines are equivalent or to imply that the fortuity doctrine could bar coverage in this case.

Indeed, the *Aetna* court relied upon the rationale set out by a federal district court's discussion of the known loss doctrine.  *See Aetna Cas. & Sur. Co.*, 179 S.W.3d at 836(citing *Aetna Cas. & Sur. Co. v. Dow Chemical Co.*, 10 F.Supp.2d 771, 790 (E.D. Mich. 1998)).[7]  The Sixth Circuit also endorsed the loss-in-progress doctrine, holding that both the Supreme Court of Tennessee and the Supreme Court of Michigan would adopt it if afforded the opportunity.  *Am. & Foreign Ins. Co.*, 441 F.3d at 344 (Tennessee); *Inland Waters*, 997 F.2d at 178-79 (interpreting Michigan laws).  Based on the Kentucky Supreme Court's recent discussion of the fortuity doctrine and the Sixth Circuit's persuasive authority, this Court today likewise concludes that the Kentucky Supreme Court would adopt the loss-in-progress doctrine.

The Court must also settle upon the precise standard that describes the doctrine.  In *Inland Waters* the Sixth Circuit held that the loss-in-progress doctrine precludes coverage where "the insured is aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and that the insured knew it at the time the policy was issued or applied for."  *Inland Waters*, 997 F.2d at 178.  As defined here, the loss-in-progress doctrine, does not apply only where the insured knows that a lawsuit has been filed against it or that it has incurred actual legal liability.  *Am. & Foreign Ins. Co.*, 441 F.3d at 346.  Rather, the doctrine may apply where the insured has subjective knowledge of the damages that could underlie a legal claim against it.  *Id.*[8]

---

[7] Both defenses go to the basic "insurability" of the risk.  The fact that the Kentucky Supreme Court in *Aetna* cited a federal case that defined the known loss doctrine demonstrates how closely the two doctrines are related.

[8] In *Am. & Foreign Ins. Co.,* a contractor advised the insured-manufacturer that its products were malfunctioning.  The insured denied liability.  During this same time the insured purchased a new insurance policy.  Then the contractor sued the insured.  The Sixth Circuit found that the loss-in-progress doctrine barred coverage because, at the time of the policy's inception, the insured had subjective knowledge of damages that could underlie a legal claim against it even though no suit had yet been filed.  *Am. & Foreign Ins. Co.*, 441 F.3d at 346.

15

For the doctrine to apply, those damages must form the basis of the legal claim for which the insured now seeks coverage. *See Aetna Cas. & Sur. Co. v. Dow Chemical Co.*, 10 F. Supp. 2d 771, 790 (E.D. Mich. 1998) ("The crucial issue is whether [the insured] was aware, at a minimum, of an immediate threat of the [injury] for which it was ultimately held responsible and for which it now seeks coverage . . . .").

The Court concludes that the Kentucky Supreme Court would adopt the Sixth Circuit's formulation of the loss-in-progress doctrine. In *Aetna*, the Kentucky Supreme Court relied on the Eastern District of Michigan's definition of the loss-in-progress doctrine in its analysis of the fortuity doctrine. *Aetna Cas. & Sur. Co.*, 179 S.W.3d at 836. In fact, the Kentucky *Aetna* court expressly incorporated the definition of the loss-in-progress doctrine enunciated in *Dow Chemical Co.* into its definition of the fortuity doctrine. *Id.* That definition is perfectly consistent with the formulation of the doctrine explained above.

B.

Now the Court must apply this standard to our facts. To determine whether the loss-in-progress doctrine precludes coverage here, the Court must determine whether Pizza Magia was "aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and that the insured knew it at the time the policy applied for." *Inland Waters*, 997 F.2d at 178. The "loss" at issue in this case is the harm that Papa John's suffered as a result of Pizza Magia's trademark and trade dress infringement.  Accordingly, the question is whether Pizza Magia was subjectively aware of the harm caused by its infringing activities prior to September 1, 2000. That harm, unlike the injury in a pollution case like *Aetna*, is intangible and difficult to identify. Therefore, it is especially difficult for the Court to determine when Papa John's identified those

16

injuries and when Pizza Magia became aware of them.

Assurance has set out the following factual grounds for the loss-in-progress defense.

Counsel for Papa John's sent three letters to J. Daniel Holland ("Holland"), who was the Chief

Executive Office of Pizza Magia, threatening legal action before Pizza Magia purchased its CGL

policy from Assurance.  Papa John's counsel sent the first letter on October 29, 1999.  That letter

began by expressing Papa John's concern about Holland's breach of fiduciary duty, and went on

to make the following statements:

> Our firm has been retained by Papa John's International Inc. . . . to investigate
> other potential claims against you and officers or directors of Pizza Magia.  These
> claims include . . . misappropriation of trade secrets and tortious interference with
> Papa John's business.

***

> Section 17 of your Franchise Agreements (and comparable sections of the
> Development Agreements) specifically prohibits the use of confidential or
> proprietary information of Papa John's, including at any time after the expiration
> or termination of the franchise.  This prohibition applies to all aspects of Papa
> John's operations, including "knowledge or know-how concerning the recipes,
> food products, advertising, marketing, designs, plans software, programs or
> methods of operation."  Your recent venture with Pizza Magia, and the tactics
> employed by its officers, directors and agents in developing this competing
> business, further breaches both the Franchise and Development Agreements.

> It is apparent that Pizza Magia's concept, processes and products not only imitate
> but are directly derived from those of Papa John's.  We believe that copying these
> and other processes of Papa John's is a misappropriation of protected recipes and
> methods of operations belonging to Papa John's and is likely to cause confusion
> among consumers as to whether Pizza Magia is somehow affiliated with Papa
> John's. *** Accordingly, Pizza Magia must immediately cease its attempt to
> duplicate the recipes, products and methods of operations of Papa John's.

***

> You must immediately cease all involvement with Pizza Magia, stop the
> duplication of Papa John's processes and products by Pizza Magia and halt any
> further opening of Pizza Magia restaurants.  If necessary, Papa John's will seek

17

court intervention to obtain injunctive relief against you and Pizza Magia to enforce the terms of your Franchise and Development Agreements with Papa John's, and will further pursue costs, legal fees and monetary damages.

In short, Papa John's threatened suit for misappropriation of trade secrets, breach of fiduciary duty, tortious interference with its business, and breach of confidentiality and non-competition agreements.

Pizza Magia responded by denying any wrong doing. On November 15, 1999, Papa John's counsel sent a letter similar to the first. Papa John's counsel sent a final letter on December 14, 1999, stating that "Papa John's will seek redress from . . . Pizza Magia unless Pizza Magia can demonstrate that its methods of operation and product are not materially derived from confidential information of Papa John's." On September 13, 2000, that is precisely what Papa John's did. Based on this evidence, a reasonable juror could conclude that Pizza Magia was subjectively aware of the harm it had caused Papa John's by infringing its trademarks and trade dress when it applied for the policy.

However, a reasonable juror could also conclude that Pizza Magia was unaware of the relevant injuries. Papa John's letters never mentioned trade dress infringement, trademark infringement or any other theory of liability sought to be covered now. The absence of those warnings suggests that not even Papa John's was aware of the harm caused by Pizza Magia's trade dress and trademark infringement at that time. Moreover, Papa John's did not express any dissatisfaction with Pizza Magia's manner of conducting business for a nine-month period between December 14, 1999 and September 13, 2000. Accordingly, a reasonable juror could conclude that Pizza Magia had no reason to believe that it had caused Papa John's harm until after it entered into the policy at issue. Therefore, summary judgment is inappropriate at this

18

time.

Relying on KRS § 304.20-320, Pizza Magia and Ohio Casualty argue that Assurance waived the right to assert the loss-in-progress doctrine because it failed to cancel the policy after learning that Papa John's had filed suit.  That provision authorizes an insurer to cancel an insurance policy within 60 days of the effective date of the policy.   According to Pizza Magia and Ohio Casualty, Assurance learned of Papa John's lawsuit within the 60-day window but decided to issue the policy anyway.[9]  However, even if Assurance had  the right to cancel, their failure to do so did not constitute a waiver.  Waiver, as applied to contracts of insurance, requires a "voluntary and intentional relinquishment of a known, existing right or power under the terms of an insurance contract." *Howard v. Motorists Mut. Ins. Co.*, 955 S.W.2d 525, 526 (Ky. 1997) (citation and internal quotations omitted).  In this case, Assurance did not discover the evidence supporting the loss-in-progress defense until well after the 60 days had expired.  Therefore, Assurance did not intentionally relinquish a known legal right by failing to cancel the policy pursuant to § 304.20-320.

Based on the foregoing analysis, the Court concludes that a genuine issue of material fact exists as to whether the loss-in-progress doctrine precludes indemnity coverage in this case.

V.

The Court must next address whether Assurance is liable for failing to defend Pizza Magia.  In Kentucky, the duty to defend is separate and distinct from an obligation to pay a claim.  *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273,

---

[9] There is some question as to whether Assurance had the right to cancel the policy during the 60-day period. Assurance argues that it did not have the right to cancel the policy under the language actually employed in the policy.  However, the Court need not address that question because the Court finds that Assurance's failure to cancel the contract did not constitute a waiver in any event.

280 (Ky. 1991).  An insurer has a duty to defend if there is an allegation that potentially, possibly or might come within the coverage terms of the policy.  *Aetna Cas. & Sur. Co.*, 179 S.W.3d at 841 (citation omitted).  The determination of whether a defense is required must be made at the outset of the litigation by reference to the complaint and known facts.  *Lenning v. Commercial Union Ins. Co.*,  260 F.3d 574, 581 (6th Cir. 2001) (applying Kentucky law) (citing *Brown Found.*, 814 S.W.2d at 279).

Here, the Complaint alleged, among other things, that Pizza Magia engaged in trade dress infringement by advertising and selling pizzas that were confusingly similar in look and taste to Papa John's pizzas.  At the time the Complaint was filed, a number of courts in other jurisdictions had held that claims of trade dress infringement do constitute an  "advertising injury" under identical CGL policies.  *See, e.g.*, *St. Paul Fire & Marine v. Advanced Int'l Sys., Inc.*, 824 F. Supp. 583 (E.D. Va. 1993); *Elcom Tech., Inc. v. Hartford Ins. Co. of the Midwest*, 991 F. Supp. 1294 (D. Utah 1997); *Indus. Molding Corp. v. American Mfr. Mutual Ins. Co.*, 17 F. Supp. 2d 633 (N.D. Tex. 1998).  Although it was then an open question in Kentucky, the law of this case is now that the allegations here do constitute an "advertising injury" within the meaning of the policy.

Another important fact is that when the Complaint was filed, Assurance did not know of any facts extrinsic to the Complaint that justified a refusal to defend.  To be sure, Assurance eventually discovered grounds for the loss-in-progress defense.  But Assurance had no factual basis for asserting that defense until after the filing of the First Amended Complaint, two and a half years after the onset of the litigation.  Only then did Assurance first learn that Papa John's had repeatedly threatened suit prior to the inception of the policy.  During the intervening two-

and-a-half year period, Assurance was without any basis to categorically deny coverage. Consequently, it had a duty to defend.  Their failure to provide the defense was a breach of contract and Pizza Magia is entitled to recover all naturally flowing damages irrespective of any limit in the policy.  *Eskridge v. Educator and Executive Insurers, Inc.*, 677 S.W.2d 887, 889 (Ky. 1984).

VI.

Pizza Magia claims that Assurance's failure to defend constitutes bad faith under Kentucky law.  It alleges that Assurance received notice of the lawsuit on or about September 14, 2000, and after conferring with in-house counsel, declined coverage because the allegations did not constitute an "advertising injury."  But there is a factual dispute as to when Assurance communicated its denial to Pizza Magia.

Assurance claims that it notified Pizza Magia of the coverage denial by telephone in October of 2000 and again in a letter dated October 10, 2001.  Pizza Magia says that the alleged phone conversation never took place and that it never received that letter.  Pizza Magia claims that it received no response to its demand until February 26, 2003.

In Kentucky, a claim for bad faith based on an insurer's denial of coverage requires proof of the following: (1) the insurer was obligated to pay the claim under the terms of the policy; (2) the insurer lacked a reasonable basis in law or fact for denying the claim; and (3) the insurer either knew that there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.  *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993) (citation omitted); see also Ky. Rev. Stat. Ann. § 304.12-230.

In this case, although Assurance had a contractual duty to defend Pizza Magia, its

21

decision not to do so cannot constitute bad faith.  Bad faith is not established if an insurer's failure to provide a defense is based upon a reasonable interpretation of the insurance policy. *Wittmer*, 864 S.W.2d at 890 (an insurer is "entitled to challenge a claim and litigate it if the claim is debatable on the law or the facts") (quotation and citation omitted).  Although Assurance's interpretation of the policy was incorrect, it was not recklessly unreasonable.  In fact, the Sixth Circuit had already adopted Assurance's reasoning in *Advance Watch*, holding that trade dress infringement does not constitute an "advertising injury" as defined in an identical CGL policy.

The question then is whether Assurance's alleged failure to communicate its denial can constitute bad faith under Kentucky law.  This Court concludes that it cannot.  Generally, a claim of bad faith requires proof of " 'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.' " *Guaranty Nat'l Ins. Co. v. George*, 953 S.W.2d 946, 949 (Ky. 1997) (quoting *Wittmer*, 864 S.W.2d at 890).  In this case, there is no proof that Assurance's claims adjuster acted recklessly or with an evil motive.  On the contrary, the uncontroverted evidence is that the adjuster read the Complaint, read the policy, requested a coverage opinion from the legal department and decided to deny the claim based on the advice he received.  There is no evidence that the adjuster acted with reckless indifference when he allegedly failed to notify Pizza Magia that the claim had been denied.  The adjuster knew that Ohio Casualty had already agreed to defend the claims; he, therefore, knew that Assurance's failure to defend could not effectively prejudice Pizza Magia's defense; and accordingly, Assurance's failure to defend could not have been reckless or intentionally harmful.  Therefore, summary judgment on Pizza Magia's bad faith claim is appropriate.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record